# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GARRICK, Minors.

UNPUBLISHED
June 21, 2018

Nos. 340691; 340692
Gogebic Circuit Court
Family Division
LC No. 2015-000008-NA

Before: MURRAY, C.J., and MARKEY and TUKEL, JJ.

PER CURIAM.

In Docket No. 340691, respondent-mother appeals as of right the trial court's order terminating her parental rights to her five children under MCL 712A.19b(3)(g) and (j). In Docket No. 340692, respondent-father appeals as of right the same order, which terminated his parental rights to the children under the same grounds. We affirm.

## I. BASIC FACTS

The children were previously removed from respondents' care due to substance abuse and unclean living conditions in 2013. While in foster care placement with respondent-father's mother (i.e., the children's grandmother), the grandmother's boyfriend allegedly sexually abused one of the children. The children ultimately were returned to respondents' care. However, in March 2015, police raided respondents' home and discovered "bath salts"[1] and filthy living conditions. The children were not enrolled in school. The children were again removed. At the time of removal, respondents owed more than $3,000 in rent and had been evicted from a previous home for owing $8,400 in rent.

---

[1] "Bath salts" are not to be confused with products such as Epsom salts. National Institute on Drug Abuse, *Synthetic Cathinones ("Bath Salts")* <http://www.drugabuse.gov/publications/drugfacts/synthetic-cathinones-bath-salts> (accessed June 12, 2018). Instead, the term "bath salts" is a term for synthetic cathinones, which are "human-made stimulants chemically related to cathinone, a substance found in the khat plant." *Id.* "Synthetic cathinones are part of a group of drugs that concern public health officials called 'new psychoactive substances' (NPS). NPS are unregulated psychoactive mind-altering substances with no legitimate medical use and are made to copy the effects of controlled substances." *Id.*

When the children were placed in foster care, they exhibited signs of severe neglect. DG, who was then 14 years old, weighed 312 pounds, believed he had autism, and was suicidal. CG had an untreated stutter and was academically delayed. AG, then five years old, did not know shapes, could not recognize letters or numbers, and did not know how to dress himself or use a toilet. Testing revealed that, despite respondents' allegations, none of the children had autism or pervasive developmental disorders.

During the two-year pendency of the case, respondents frequently missed parental visits. Respondent-father acquired a job in Wisconsin and persisted in living with his mother and her boyfriend. Respondent-mother repeatedly claimed that financial difficulties and car troubles prevented her from visiting the children, but she did not turn in mileage reimbursements and did not timely respond to the agency's offer to purchase a vehicle. It was later discovered that respondent-mother had a vehicle in her name, in which she had been seen driving, but claimed that someone else owned it. When respondents claimed that they could not attend weekday visitations due to their work and school schedules, visitations were scheduled on Sundays. After respondents missed three Sunday visitations in a single month, the agency determined that it would only grant weekend visitations if respondents verified their work schedules. Respondents failed to do so. Respondents also made only between 30% and 50% of their scheduled telephone visits with the children.

Despite having five months of fully subsidized rent, eviction proceedings were begun against respondent-mother in May 2016 at her home in L'Anse. Respondent-mother left the home in September 2016. Respondent-mother later testified that she subsequently lived in a homeless shelter, temporary housing, and at two addresses in Wisconsin. Respondent-father continued to live with his mother and her boyfriend. By the time of the termination hearing, only one child wanted to be returned to respondents' care, and another child testified against respondents because he wanted to protect his siblings from "go[ing] through what [he] had to go through."

The trial court found that grounds for terminating respondents' parental rights existed under MCL 712A.19b(3)(g) and (j). The court found clear and convincing evidence that respondents could not provide the children with proper care and custody. It found that respondents did not benefit from services, did not take responsibility for their actions, and were not honest about their vehicle's status or missing parenting time. Respondents were unable to provide the children with suitable housing. Further, the trial court found that respondents lacked "the skills or desire to be parents," finding that they had seriously neglected the children, failed to engage with them as parents, and missed extensive parenting time. Respondents had also refused to cooperate with having the children's medical and emotional needs addressed in care and continued to insist that the children were autistic, despite professional evaluations to the contrary.

The trial court also found clear and convincing evidence that the children were reasonably likely to be emotionally harmed and physically neglected if they were returned to respondents' care. The court found that the children came into care with issues that included physical violence against each other, food hoarding, and medical neglect. It found that the children had been unsure of their ages, could not tell time, and lacked basic living skills.

Respondents had been resistant to services and had not demonstrated an ability to provide the children with a safe and stable home.

Considering the children's best interests, the court found that the children did not wish to be reunited with respondents, some children did not even wish to visit with them, and one child had testified that the court should protect his siblings from respondents by removing them from respondents' care. It found that the children lacked basic life skills when entering foster care, but had progressed "significantly to being normal children" while in foster care. Accordingly, the trial court found that termination of respondents' parental rights was in the children's best interests.

## II. REASONABLE EFFORTS

Both respondents argue that the trial court violated their constitutional right to due process by placing the children at great distances from respondents' home. Respondent-father additionally argues that the agency deprived him of due process by failing to provide him with the necessary services to reunify him with his children. We reject respondents' arguments because the state did not deliberately create a barrier to reunification when it was unable to place all five children together in the same area, and it provided sufficient services to respondent-father, who simply refused to avail himself of the services.

As an initial matter, we note that these issues are not preserved. To preserve an issue challenging the reasonableness of petitioner's reunification efforts, a parent must object to a service plan when it is adopted or shortly thereafter. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012); *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000). In this case, the decision to split up the children into two sibling groups and place them out of their home county was approved on May 15, 2015. However, respondent-mother never raised the issue of the separate placements or the distance of the children's placement from her home as either a reasonable-efforts issue or as a constitutional issue, and respondent-father did not raise the issue of the children's placement and a lack of services until more than a year after the children's service plan was adopted and the children were in placement. Therefore, we conclude that these issues are not preserved. Generally, this Court reviews de novo questions of constitutional law, including whether the trial court's proceedings protected a parent's right to due process. *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014). However, this Court reviews unpreserved constitutional claims for plain error affecting the parent's substantial rights. *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). To the extent that the trial court addressed the reasonableness of petitioner's reunification efforts, this Court reviews for clear error the trial court's factual findings and ultimate decision whether reasonable efforts were made to reunify a child with his or her parent. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake. *Id*.

"Due process applies to any adjudication of important rights." *In re Brock*, 442 Mich 101, 110; 499 NW2d 752 (1993) (quotation marks and citation omitted). Parents have a significant constitutional liberty interest in the care and custody of their children, which is protected by the right to due process. *Stanley v Illinois*, 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972). The petitioner must make reasonable efforts to reunify a child with his or her

family unless aggravating circumstances are present. *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). Observing that it is a violation of due process for the state to intentionally create the grounds on which termination of parental rights is based, see *In re B & J*, 279 Mich App 12, 19; 756 NW2d 234 (2008), respondents complain that petitioner did just that by placing the children in foster care placement at great distances from them. They contend that the lengthy distance constituted a barrier to reunification.

Regarding respondent-mother, from the beginning of the case, petitioner struggled to find a placement that could take all five children. Petitioner investigated the home of respondent-father's sister in Wisconsin, but it was not large enough for all five children. Foster care caseworker Jessica Chevalier testified that she looked into foster homes near respondent-mother's home in L'Anse, but there were only two homes available, which could take only one child each. Chevalier stated that there were no foster homes in Marquette that could take the three younger children, and no foster homes in Iron Mountain that could take the two older children. Foster care supervisor Tracey Compton testified that the only homes available to take all five children would be "down state," presumably even further from respondent-mother's home in L'Anse. Therefore, petitioner obtained approval to split the children into two sibling groups and place them in a neighboring county. The record reflects that it was the circumstances of the case—which involved five children of greatly varying ages—rather than a deliberate action by the state that resulted in the children's different placements.

Contrary to respondent-father's argument, petitioner did investigate the possibility of placing the children with respondent-father's family. On May 21, 2015, respondent-father told the agency that no relative placement options were available, and he "reported that his mother would not be a good placement option." Petitioner investigated his sister's home, but it was not large enough for all five children.

Respondent-father also argues that he was not provided with necessary reunification services. We disagree because the record reflects that petitioner provided respondent-father with the opportunity to participate in services, but he declined to do so. While the agency is obligated to provide parents with services, "there exists a commensurate responsibility on the part of [parents] to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. Respondent-father did not dispute that he was offered—but declined—mileage reimbursement and that respondent-father participated in parenting class worksheets. Chevalier testified that she offered respondent-father other services, but he declined to participate in them because they interfered with his work. The prior foster care caseworker, Kendra Goedert, documented that respondent-father was approached about voluntary services before adjudication, but he became defensive and refused to participate in services. Respondent-father also stated that he could not participate with the parenting aide because of his work schedule. Multiple caseworkers and extensive documentation in this case is devoted to requests to respondent-father to provide his work schedule, but to no avail as respondent-father never provided a response. Respondent-father also refused to consider seeking other employment, despite the difficulty the circumstances surrounding his employment placed on his participation in services. Ultimately, in May 2016, when respondent-father's employer was contacted, the employer stated that respondent-father was an independent contractor who made his own schedule. The trial court did not clearly err when it found that petitioner made reasonable efforts to reunify respondent-father with the children.

-4-

Additionally, respondent-father argues that he was denied due process when petitioner ended services after it filed the supplemental petition for termination. Again, we disagree. Petitioner need not provide services to every family in every situation. *In re Plump*, 294 Mich App 270, 272; 817 NW2d 119 (2011). "Services need not be provided where reunification is not intended." *In re LE*, 278 Mich App 1, 21; 747 NW2d 883 (2008). Accordingly, there was no error in ending services once reunification was no longer intended.

## III. STATUTORY GROUNDS

Both respondents argue that the trial court clearly erred by finding that statutory grounds for terminating their parental rights were established under MCL 712A.19b(3)(g) and (j). We disagree.

The petitioner has the burden of proving a statutory ground for termination by clear and convincing evidence. *In re Mason*, 486 Mich at 152. Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks and citation omitted). The trial court's factual findings and ultimate determinations regarding the statutory grounds for termination are reviewed for clear error. *In re Mason*, 486 Mich at 152. A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake. *Id*.

MCL 712A.19b(3)(g) provides that the trial court may terminate a parent's rights if

[t]he parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

MCL 712A.19b(3)(j) provides that the trial court may terminate parental rights if

[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). A parent's failure to comply with his or her service plan is also evidence that the parent will not be able to provide a child with proper care and custody and that the child may be harmed if returned to the parent's home. *Id*. at 710-711. When a parent makes progress on some aspects of a service plan, it does not establish that a parent has demonstrated compliance with and benefit from the entire plan. See *id*. at 711-712.

## A. RESPONDENT-MOTHER

First, respondent-mother argues that the trial court clearly erred when it found that she lacked stable housing because she had maintained a home in L'Anse and she had acquired a

home in Wisconsin. She contends that the trial court essentially terminated her parental rights because she could not budget. Respondent-mother's assertions lack merit because the evidence supports the trial court's findings about her housing instability, and respondent-mother's inability to budget was directly related to her issues with housing instability.

A parent's inability to maintain a stable environment due to persistent financial problems may support a finding that a parent cannot provide proper care and custody. *In re BZ*, 264 Mich App 286, 299; 690 NW2d 505 (2004). Parental homelessness may also support such a finding. See *In re Moss*, 301 Mich App 76, 81; 836 NW2d 182 (2013). In this case, the issues with respondents' housing stability preceded the children's removal from care. At the time of the children's removal, respondent-mother owed $3,305 in rent and had been evicted from another home for owing $8,400 in rent. Compton testified that respondent-mother's rent on her home in L'Anse was prepaid for the first five months, but the first month in which she became responsible for rent, she was late paying the rent and incurred a late fee. Respondent-mother denied that she was evicted from the home, but she acknowledged that she moved from the home in September 2016 and that she did not pay rent on the home for four or five months. At the termination hearing, respondent-mother testified that she had lived in a homeless shelter, temporary lodging, and two different houses in Wisconsin. Additionally, there was direct evidence that the lack of stable housing was harmful to the children. The oldest child, who had been suicidal when he entered foster care, testified that he was depressed from moving and changing schools so much.

Additionally, contrary to respondent-mother's assertion, the trial court did not terminate her parental rights because she could not budget. Various witnesses testified that learning how to budget was simply a skill designed to help respondent-mother maintain stable housing. We are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-mother could not provide the children with proper care and custody because she lacked stable housing.

Second, respondent-mother argues that her compliance with the service plan showed that she could provide the children with proper care and custody. We reject respondent-mother's argument because the evidence established that she only complied with portions of her service plan.

This Court defers to the special ability of the trial court to judge the credibility of witnesses. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). In this case, it is undisputed that respondent-mother complied with and benefited from some services. Parent aide Lindsey Laakso testified that she helped respondent-mother obtain a substance abuse assessment and that there were no problems with the physical condition of respondent-mother's home. Chevalier testified that respondent-mother had made progress with her substance abuse issues. However, compliance with some services does not establish that a parent complied with and benefitted from the entire service plan. As indicated previously, respondent-mother lacked stable housing. Respondent-mother also continued to blame petitioner for the children's removal and blamed the children's lack of age-appropriate development on autism. At the same time, respondent-mother refused to devote 15 minutes of her parenting visits to educational activities, stating to the agency that she did not feel she should have to spend her parenting time on such activities. We

are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-mother did not benefit from all her services.

Third, respondent-mother argues that the issues with her parenting time attendance did not establish that she could not provide the children with proper care and custody because the issue was created by the agency. We reject this argument because, for the reasons previously discussed, petitioner did not create the issue with the children's placement. Additionally, voluminous testimony established that petitioner attempted to assist in parenting visitation by (1) offering a hotel room between visits, which was withdrawn after respondents left hair dye on a countertop and the hotel refused to allow respondents to return, (2) mileage reimbursement, (3) the purchase of a vehicle, and (4) offering a driver to get respondents to and from parenting visits. While respondents disputed their access to and the effectiveness of these services, the trial court did not find respondents' claims credible, and we are not left with a definite and firm conviction that the trial court erred.

Fourth, respondent-mother argues that the trial court clearly erred when it found that the children were likely to be harmed if returned to her care. We disagree. Under § 19b(3)(j), a trial court may consider potential emotional harm to the child caused by the parent's conduct or capacity. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). Additionally, "[e]vidence of how a parent treats one child is evidence of how he or she may treat the other children." *Id*. at 266. Respondent-mother had not rectified her issues with housing stability, when housing instability had contributed to one child's suicidal depression. The children were diagnosed with developmental difficulties due to environmental neglect. Respondent-mother refused to recognize that her children were behind academically, and she continued to insist that the children were autistic. Additionally, respondent-mother physically neglected her children's needs. She refused to allow the older child to have his wisdom teeth removed, and failed to attend or was late to many medical and dental appointments.

Accordingly, we are not definitely and firmly convinced the trial court made a mistake when it found that respondent-mother could not provide the children with proper care and custody, and that the children were reasonably likely to be harmed if returned to respondent-mother's care. Respondent-mother failed to participate in and benefit from her entire service plan.

## B. RESPONDENT-FATHER

Respondent-father argues that the trial court erred by finding that he could not provide his children with proper care and custody because he had housing that the agency did not evaluate as a potential placement. Respondent-father also contends that he was never given the opportunity to demonstrate that he could parent in a home-like setting.

A lack of proper parental housing may support a trial court's finding that a parent cannot provide proper care and custody. See *In re Moss*, 301 Mich App at 81; *In re BZ*, 264 Mich App at 299. In this case, respondent-father was residing with his mother and her boyfriend, who had allegedly sexually abused one of the children. Respondent-father himself had informed the agency "that his mother would not be a good placement option." When respondent-father received his updated service plan in June 2016, it clearly indicated that respondent-father's

residence would not be an appropriate placement for the children. As previously discussed, petitioner evaluated and rejected placement with respondent-father's sister because she lacked room for all of the children. To the extent that respondent-father argues he was not given the opportunity to demonstrate he could parent in a home-like setting, this was attributable to his decision to live in an inappropriate home. We are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-father's home was inappropriate for the proper care and custody of the children.

We also reject respondent-father's argument that the trial court set him up for failure by placing the children at a distance from respondent-mother's residence for the reasons previously discussed. Regardless, respondent-father himself testified that his issues with attending parenting visits were not placement-related issues. When asked whether transportation had been an issue for parenting time, respondent-father said his main issues had been work, jail, and an injury. Both respondent-father and Compton testified that respondent-father had declined transportation assistance. There is no indication in the record that transportation was a barrier to reunification with respondent-father in any way.

Respondent-father further argues that lack of money is not a proper ground to terminate parental rights. The trial court's comment on respondent-father's failure to document his inconsistent pay and provide a work schedule was directly related to respondent-father's decision not to attend parenting times. There is no indication that the trial court relied on respondent-father's income as a separate, individual basis to terminate his parental rights.

Next, respondent-father argues that petitioner never attempted to address respondents' communication difficulties and that he was never given parenting schedules. Extensive testimony from Compton and Chevalier addressed their difficulties in communicating with respondent-father. Compton was concerned that respondents did not understand what they needed to do to have their children returned to their care, but as she became involved in the case, she realized "it was really more of them trying to put blame on the agency versus the[m] taking responsibility." Compton testified that she made repeated offers to go over respondent-father's service plan with him, but respondent-father largely failed to respond. While respondent-father testified otherwise, we defer to the trial court's ability to judge the weight and credibility of the witness testimony. We are not definitely and firmly convinced that the trial court made a mistake when it found that petitioner reasonably attempted to address respondents' communication difficulties.

Respondent-father also complains that petitioner attempted to sabotage respondents' parenting time and refused to consider Sunday visitation. The record does not support this claim. Respondent-father testified that weekend visitation on Sundays would have been "perfect" to accommodate his work schedule. However, the record discloses that petitioner attempted to accommodate respondent-father's work schedule in exactly this manner, but respondent-father then missed multiple weekend parenting times. The trial court found that respondent-father had not been honest about the reasons he missed parenting time and did not demonstrate that he had the desire to be a parent. We are not convinced that the trial court made a mistake.

Next, respondent-father argues that he actively participated in services throughout this case and the trial court erred by finding otherwise. Respondent-father's argument lacks record

support. Chevalier stated that respondent-father had declined to participate in most services because he claimed to be busy working. The record reflects several instances in which respondent-father himself admitted that he declined particular services. We are not definitely and firmly convinced that the trial court made a mistake when it found that respondent-father had not participated in all necessary services.

The remainder of respondent-father's arguments lack record support. There is extensive support in the record for the trial court's finding that the children did not in fact have autism, and additional support that the agency did investigate respondent-father's placement options. On the balance of the record, we conclude that the trial court did not clearly err by finding that the statutory grounds for termination were established by clear and convincing evidence with respect to respondent-father.

## IV. BEST INTERESTS

Both respondents argue that the trial court erred when it found that termination of their parental rights was in the children's best interests. Respondent-mother argues that she was bonded to the children and that her hostile relationship with the agency and a foster parent was not a valid reason to terminate her parental rights. Respondent-father argues that there was no evidence that he would have physically harmed his children if they were returned to his care and that the children's placement created their issues with parental bonds. We reject these arguments.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. We review a trial court's determination regarding a child's best interests for clear error. *In re White*, 303 Mich App at 713.

To determine whether termination of a parent's parental rights is in a child's best interests, the court may consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The trial court should weigh all the evidence available to determine a child's best interests. *In re White*, 303 Mich App at 713.

In this case, the trial court found that the children came into foster care without basic life skills, but they had progressed in care "significantly to being normal children." It also found that the children preferred not to be reunited with respondents. Additionally, the court found that DG had expressed a clear, honest opinion that the children should be protected from growing up with respondents. There is no indication that the trial court placed any weight on the hostility between respondent-mother and the foster parent when determining the children's best interests. Instead, the court focused on the children's poor bonds with respondents and the significant improvement in their development after their foster home placement. These were valid

considerations, see *In re Olive/Metts*, 297 Mich App at 41-42, and the record clearly supports the trial court's findings regarding these factors.

When the children came into care, the older children were seriously overweight and the children all had difficulties with food. The children did not know the basics of taking care of themselves, were academically delayed, and believed they were autistic when they were not. While in foster care, the children made substantial improvements. In some instances, those improvements were seen within three months in foster care. The younger children's behaviors improved, and the older children improved in school and improved in hygiene and life skills. Chevalier testified that three of the children did not want to be returned to respondents' care. One child wanted to be returned to respondents' care, but said he would be "okay" staying in foster care. One of the children adamantly testified that the trial court should terminate respondents' parental rights to protect the younger children.

The trial court did not clearly err by finding that the children lacked a bond with respondents. The evidence established that the children either did not want to be returned to respondents' care or were at best ambivalent. Additionally, the record establishes that the children made extensive progress once removed from respondents' care and placed in foster care. As a result, we are not definitely and firmly convinced that the trial court made a mistake when it found that termination of each respondent's parental rights was in the children's best interests.

Affirmed.

/s/ Christopher M. Murray
/s/ Jane E. Markey
/s/ Jonathan Tukel